# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| CATHY VALDEZ, as Administratrix of the ESTATE OF JAMES H. HELTON, JR., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **2:11-cv-00484-PPS** |
| vs. | ) | |
| | ) | |
| CORIZON, INC., f/k/a CORRECTIONAL MEDICAL SERVICES, INC., *et al*, | ) ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

The Personal Representative of James Helton's Estate sued Indiana State Prison

and its medical services contractor Corizon, and various employees of each, after

Helton died from an infection and heart disease while in their custody. Helton's Estate

believes that his death was due to inadequate medical care in the prison. The claims

against the prison were previously dismissed, as were the claims against unnamed

individual defendants, so only the claims against Corizon are still pending. While I

sympathize with Helton's family, the only way to hold Corizon liable on the federal

claims is to establish that a specific policy or established practice of the company led to

Helton's death; negligence by Corizon's doctors and nurses, even if it were shown in

this case, wouldn't cut it. The Estate uses the "custom, policy, or practice" buzzwords in

the complaint, but there's never any suggestion of what the policy was beyond a

generalized suggestion of bad prison healthcare, nor any evidence of it beyond Helton's

death. So summary judgment on the federal claims must be granted in favor of Corizon,

and I will relinquish jurisdiction over the remaining Indiana state law claim of wrongful death.

## BACKGROUND

According to the complaint, Helton was incarcerated at Indiana State Prison from November 2003 to December 26, 2009. Helton sought medical care on December 12, 2009 because he was bloated and had been having trouble going to the bathroom for three weeks. Other inmates noticed that Helton's hands blackened, his lips turned blue, and he had other changes in skin color. On December 18, 2009 Corizon medical staff was told that Helton couldn't eat, sleep or urinate. On December 26, 2009, Helton was found dead in his cell.

Helton's Estate and his minor child sued the prison and its Superintendent, Bill Wilson, the Indiana Department of Correction, various unnamed individuals, and Corizon (which was previously called Correctional Medical Services, but I'll just call it Corizon). There is federal question jurisdiction because some of the Estate's claims arise under federal law, specifically 42 U.S.C. § 1983 and the Eighth Amendment. Corizon answered the complaint. (DE 10.) Indiana State Prison and Superintendent Wilson moved to dismiss. (DE 14.) I granted their motion and dismissed all of the claims against them, mostly with prejudice. I also dismissed without prejudice the unnamed "Doe" defendants, allowing the Estate to discover the actual names of the supposedly offending parties and to amend the complaint accordingly. (DE 21.)

The Estate filed an amended complaint against Corizon and seems to have reasserted claims against the Doe defendants. (DE 22.) Corizon answered the amended complaint. (DE 24.) A period of discovery followed that appears to have been uneventful, except for an extended deadline regarding Corizon's expert witness disclosures. (DE 36, 37.) At a telephone conference that I convened after discovery had closed, counsel for plaintiff indicated that additional discovery might be needed. (DE 41.) Plaintiff has filed nothing regarding additional discovery since then. (*See* DE 41-53.) Based on the briefing schedule set at the phone conference, Corizon filed the dispositive motion that is the subject of this Order. (DE 42.)

The amended complaint asserts four claims: (1) a violation of 42 U.S.C. § 1983 by failing to provide medical care and treatment on the part of Corizon "and its employees who are doctors and nurses" pursuant to a custom, policy or practice; (2) Corizon was negligent in the training and supervision of its employees; (3) Corizon violated § 1983 and is subject to supervisory liability for failing to train and supervise its employees; and (4) all of the defendants are liable for Helton's wrongful death under Indiana law. In its briefing, the Estate argues that, "[i]n short, the defendants failed to observe any symptoms indicating that Mr. Helton may have a medical condition involving sepsis [("a toxic condition resulting from the spread of bacteria or their toxic products from a focus of infection," *Sepsis definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/sepsis (last visited May 7, 2014))] or cardiomegaly [("enlargement of the heart," *Cardiomegaly definition*, MERRIAM-

WEBSTER.COM, http://www.merriam-webster.com/medical/cardiomegaly (last visited May 7, 2014))].” (DE 47 at 2.)

Corizon argues that the claims all fail, some because the complaint doesn't state them such that relief is plausible, and some because the evidence in the record shows that no factual disputes remain to decide at trial. Corizon's motion attaches Helton's prison medical chart for 2009, Helton's autopsy report, and two expert witness reports analyzing the first two items. The medical records show that Helton was seen by medical personnel essentially monthly, sometimes more than once a month, and was on a battery of long-term medications for chronic health issues. (DE 46-1.) Helton's medical records show that on December 9, 2009 he was suffering from serious pain in his right buttock after pulling a muscle while walking on ice. (DE 46-1 at 42.) Helton was evaluated and treated, but the pain persisted, and he returned for medical care on December 14. (DE 46-1 at 46.) The chronic problems listed on Helton's medical records on December 14 were “hypertension essential,” “diabetes mellitus without mention of complication,” and “pure hypercholesterolemia.” (DE 46-1 at 50.) On December 17 Helton was injected with valium for severe back spasms and was given additional pain medications. (DE 46-1 at 51, 55.) On December 19 Helton received additional medical care for his back pain. (DE 46-1 at 58.) On December 20 Helton appeared to be in less distress and wanted to move to a different dorm, which a doctor approved. (DE 46-1 at 59, 60; DE 44 at 6.) Helton was found without a pulse in his cell on December 26, 2009. (DE 46-1 at 63.) Helton's death certificate lists his causes of death as fatal cardiac

arrhythmia, severe A.S.H.D. (arteriosclerotic heart disease, *ASHD definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/medical/ashd (last visited May 7, 2014)), and hypertension. (DE 46-4.) Helton's autopsy states that he suffered from severe cardiovascular disease, marked pulmonary edema and congestion, and an inflamed liver, spleen and kidney (probably due to septicemia). (DE 46-5 at 2.)

Corizon's first expert witness, Dr. Joel Kahn, a specialist in internal medicine and cardiology, opined after reviewing the medical records and autopsy report that Helton "did not present to his treating nurses and/or physician(s) with sufficient signs or symptoms to require them to provide different medical diagnosis and/or treatment for any medical condition involving hypertensive and/or atherosclerotic cardiovascular disease than was currently provided him." (DE 46-2 at 6.) Dr. Kahn indicated that Helton died due to "gross cardiac pathology," including a heart enlarged to nearly three times the normal size and significantly narrowed arteries. (*Id.*) The fact that it turned out Helton had an overwhelming infection increased the chance that Helton would suffer a cardiovascular event leading to death. (*Id.*)

Corizon's second expert witness, internal medicine and infectious disease specialist Dr. Michael McIlroy, also reviewed the records and then wrote that Helton "did not demonstrate symptoms that required him to be diagnosed with septicemia or treated for septicemia by any of his nursing or medical providers under the circumstances of this case. . . . In the present case, there is no indication that any of Mr.

Helton's nursing care or medical providers observed him at any time with symptoms that required him to be diagnosed and/or treated for septicemia." (DE 46-3 at 6.)

The Estate's response attaches four to six (two pages are essentially blank, so it's possible they were intended to contain one or two documents but counsel scanned them illegibly) letters from prisoners who knew Helton, and another copy of the autopsy report. (DE 47-1.) Assuming it's proper to consider these unsworn prisoner letters written after Helton's death, that's the only evidence the Estate offers. The first inmate letter (which has a missing patch, likely another photocopying error, that makes part of it difficult to understand) says that Helton spit blood up, which the author opined didn't have anything to do with his back, and that Helton stayed in his cell for three weeks of medical lay-in. The author also opined that Helton needed an MRI. The letter states that Helton's "boss had to fight to get him the little help if any they did for him. Clearly that shows bad medical care." (DE 47-1 at 1.) The letter makes heavy use of the pronoun "they" and refers to "the hospital here at the prison" and "[t]he Indiana State Prison Medical Department." (*Id.*) There is no specific indication of who the various "theys" are – a doctor, nurse, prison guard, or Corizon executive.

The second letter appears to be from Helton's jailhouse lawyer, and evinces no personal knowledge of Helton's medical situation, instead proffering what appears to be hearsay about Helton's medical situation and providing information about Helton's appeal of his conviction. (DE 47-1 at 2 ("He apparently became ill about two weeks

before Christmas and all the medical staff did was give him some shots in his back and would not take him too [*sic*] the hospital.").)

The third letter states that on December 8, 2009 Helton displayed flu-like symptoms, and a "few days later Helton told me that his lower back was hurting really bad." A few days after that the third letter-writer "took Helton to the Hospital, I told them that he can not sleep, pee, or eat and that he was puking. I also saw and told the Superintendent of I.S.P. that Helton should be taken to a out side [*sic*] hospital. Because I thought, that his organs was [*sic*] failing. . . . The next day he came back, and was still in pain. I then saw Helton on Dec. 25 and his hands was a black color and swollen." (DE 47-1 at 3-4.) Like the first letter, this letter does not say who "they" are that the author told about Helton's medical issues, other than the Superintendent, who was not named as a defendant in the amended complaint and doesn't work for Corizon.

The fourth and final legible letter states that Helton was ill beginning December 2 and "was having trouble going to the bathroom (urination) for 3 weeks he had pains in his sides and back. He was bloating and his skin was changing colors. They kept giving him morphine shots to dull pain. He was so ill that he couldn't eat, wash himself or anything else that we do. . . . He sat in that cell for 3 weeks asking them to send him to the hospital." (DE 47-1 at 5.) The fourth letter also states a general, albeit vague, complaint about the situation of prisoners: "No way was it natural causes [that led to Helton's death]. It was money & that we are disposable." (DE 47-1 at 5.)

Based on the briefing and evidence as described, I now take up Corizon's dispositive motion, misnamed "Motion to Dismiss and/or for Summary Judgment."

## DISCUSSION

The "Motion to Dismiss" part of Corizon's "Motion to Dismiss and/or for Summary Judgment" is obviously inappropriate at this juncture. A motion to dismiss under Rule 12(b), as Corizon indicates this is (DE 42, 44), "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). Corizon answered the complaint on January 20, 2012 (DE 10), and answered the amended complaint on November 6, 2012 (DE 24), so it's far too late for a 12(b) motion. However, the plaintiffs didn't move to strike the motion, and Corizon could refile the motion virtually without revision under Rule 12(c), so I will construe Corizon's motion as one for judgment on the pleadings or for summary judgment. *Northern Ind. Gun & Outdoor Shows v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998) ("Rule 12(c) permits a party to move for judgment after the parties have filed the complaint and answer. [] We review Rule 12(c) motions under the same standard as a motion to dismiss under Rule 12(b). [] Like Rule 12(b) motions, courts grant a Rule 12(c) motion only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." (internal quotation marks and citations omitted).) Under Rule 12(c), as under Rule 12(b), Corizon needs to show that the Estate can't prove any set of facts to prove its claims, even when viewing the facts in the light most favorable to the Estate. *Id.*; *see also Guise v. BWM Mortg., LLC*, 377 F.3d 795, 798 (7th Cir. 2004).

This point is academic on most of the issues in question here, however, because the parties have proffered evidence that I will use in most of the analysis. To the extent I use evidence outside the pleadings I hereby convert the Rule 12(c) part of the motion to a motion for summary judgment under Rule 56. *See, e.g.*, *Massey v. Helman*, 259 F.3d 641, 646 n.8 (7th Cir. 2001) ("[T]he district court did consult matters outside of the pleadings, which effectively converted the motion to dismiss into one for summary judgment on this issue.")

It follows that in deciding a motion for summary judgment I'm not restricted to the information in the pleadings, and I can consult outside evidence. Fed. R. Civ. P. 12(d) and 56. "Summary judgment is appropriate where the evidence demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)). I will review the facts in the light most favorable to the Estate, as the non-moving party. However, "[w]hen the non-moving party bears the ultimate burden of proof at trial, the non-moving party must come forward with specific facts demonstrating an issue for trial." *King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 816 (7th Cir. 2007).

Under 42 U.S.C. § 1983 a plaintiff can sue a defendant who "acts under color of state law and violates a plaintiff's rights under the Constitution or laws of the United States." *Pittman v. County of Madison*, No. 12-3233, 2014 U.S. App. LEXIS 4444, at *20 (7th Cir. Mar. 10, 2014). Generally, a prisoner "claiming a constitutional violation under §

1983 for denial of medical care must meet both an objective and a subjective component. First, he must show that his medical condition was objectively serious. . . . Second, the plaintiff must show that the defendant officials had a sufficiently culpable state of mind — that their acts or omissions were sufficiently harmful to evidence deliberate indifference to his serious medical needs. . . . An official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and the official must also draw the inference." *Id.* at 21-22 (internal quotation marks and citations omitted). So a tragic accident, and even negligence, won't result in liability under the Eighth Amendment:

> [Not] every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain. . . .
> [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). Negligence, and even gross negligence, must be raised under state tort law. *Pittman*, 2014 U.S. App. LEXIS at *29.

The Seventh Circuit's opinion in a recent case also involving Corizon's services in a prison in which an inmate died will be instructive here. In *Rice v. Corr. Med. Servs. (In re Estate of Rice)*, 675 F.3d 650 (7th Cir. 2012), an inmate suffering from schizophrenia died as a result of excessive water consumption. *Rice*, 675 F.3d at 662. The deceased's estate brought several claims against Correctional Medical Services ("CMS," now called Corizon), Corizon medical personnel individually, and prison officials and employees:

> The Estate brought this suit under 42 U.S.C. § 1983 against . . . CMS . . ., CMS nurses who worked at the Elkhart County jail, and [two named doctors], among others. The Estate contended that jail officials and staff had . . . employed policies and customs that reflected institutional indifference to the constitutional right of a mentally ill inmate to adequate medical (including psychiatric) care and protection from self-inflicted harm, and individually displayed deliberate indifference to his well-being. The Estate alleged that CMS . . . also followed policies and customs that reflected deliberate indifference to the plight of mentally ill inmates who lack the ability to care for themselves. The nurses employed by CMS to care for inmates at the jail were alleged to have manifested deliberate indifference to Rice's declining health and self-destructive tendencies. The Estate charged [the two doctors] with deliberate indifference to Rice's need for more intensive and proactive psychiatric treatment than he could obtain at the jail. In addition to the federal claims, the Estate asserted wrongful death claims under Indiana law against all defendants.

*Id.* at 663. Judge Miller ultimately granted summary judgment on the § 1983 claims, and relinquished jurisdiction on the state law wrongful death claims. The latter claims were refiled in federal court only against Corizon, and Judge Lozano dismissed it based on Judge Miller's holding in the first case that the defendants couldn't have foreseen the particular cause of Rice's death. *Id.* at 663, 688.

11

The Seventh Circuit affirmed summary judgment on Rice's § 1983 claims against Corizon because, as with a municipality, the only way to hold the corporation liable in this situation, where it was acting under color of state law, was to show that the injury was directly caused by the entity's official policy or custom. *Id.* at 675 ("Private corporations acting under color of state law may, like municipalities, be held liable for injuries resulting from their policies and practices. In order to recover against a municipal or corporate defendant under section 1983, it is not enough for the plaintiff to show that an employee of the municipality or corporation violated his constitutional rights; he must show that his injury was the result of the municipality's or corporation's official policy or custom.") (citing, among others, *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690-91 (1978); *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir. 2009) (*Monell* framework applies to private corporation acting under color of state law)). Even if a prisoner plaintiff can show poor medical care in his particular situation, that won't lead to liability for the healthcare staff's employer. The poor healthcare leading to injury must have been the result of the employer entity's policy or practice. *Id.* at 677. There is no supervisory liability in this area. *See, e.g.*, *Estate of Sims v. Cnty. of Bureau*, 506 F.3d 509, 514-15 (7th Cir. 2007) ("In order to state a § 1983 claim against a municipality, the complaint must allege that an official policy or custom not only caused the constitutional violation, but was the moving force behind it. [] Unless there is an unconstitutional policy, there cannot be official-capacity liability; only individual-capacity liability is possible. The official policy requirement for liability

under § 1983 is to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." (internal quotation marks and citations omitted)); *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002). The Seventh Circuit also affirmed in its *Rice* Opinion the grant of summary judgment on the deliberate indifference claims against individual Corizon nurses, *id.* at 681-84, but that discussion is irrelevant in this case because no individuals were named as defendants here.

A plaintiff "can establish a 'policy or custom' by showing: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Gable*, 296 F.3d at 537 (internal quotation marks and citation omitted). Because there are no allegations or evidence in this case regarding an express policy or anyone with final policymaking authority at Corizon, this claim depends on the "widespread practice" variant of the claim. There is no bright-line definition of exactly what qualifies as a widespread custom or practice for the purpose of entity policy liability under *Monell* and its progeny. However, one instance of the allegedly wrongful conduct does not a policy prove, nor do three instances. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Gable*, 296 F.3d at 538; *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988)); *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) ("If

13

the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work." (quoting *Phelan v. Cook Cnty.*, 463 F.3d 773, 789 (7th Cir. 2006) (quoting *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005)))); *Jackson v. Marion Cnty.*, 66 F.3d 151, 152 (7th Cir. 1995) ("The usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." (citation omitted)). A plaintiff need not prove many instances of the policy's enactment if there is some other direct evidence of the existence of a policy, like a statement acknowledging a policy (official or unofficial) by someone in a position to know of the policy. *See, e.g.*, *King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 816-17 (7th Cir. 2007) (finding genuine issue of fact regarding school policy where plaintiff proffered evidence that school guidance counselor stated to plaintiff after the alleged violation that it was not school policy to allow students to reenter school after hours, and that school principal stated in deposition that students present outside school hours were required to be under staff supervision).

In short, to show that an entity should be held liable for a wrongful practice widespread enough to have the force of policy, a plaintiff must demonstrate that the practice really was widespread, either by showing its prevalence in multiple instances

or by showing directly that it had the effect of or was acknowledged as policy. Simply demonstrating a single instance of wrongful behavior and alleging that it is policy, without any evidence that the behavior was systemic, will not suffice.

As a preliminary matter before launching into my analysis, since it's unclear in the amended complaint and the Estate's briefing which constitutional amendment forms the basis of the claims, I again hold (*see* DE 21) that it's the Eighth Amendment rather than the Fourteenth that applies here because the Eighth Amendment explicitly addresses the situation of prisoners. "Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display 'deliberate indifference to serious medical needs of prisoners.'" *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Where a specific provision of the Constitution covers a situation, it is that provision which must be applied rather than general substantive due process. *See United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); *Graham v. Connor*, 490 U.S. 386, 395 (1989). Although it's important to be clear about the claims, the distinction won't ultimately change the analysis. "The Due Process Clause of the Fourteenth Amendment prohibits deliberate indifference to the serious medical needs of pretrial detainees. This provision applies essentially the same deliberate indifference analysis to detainees as the Eighth Amendment does to

15

inmates." *Pittman v. Cnty. of Madison*, No. 12-3233, 2014 U.S. App. LEXIS 4444, at *20

(7th Cir. Mar. 10, 2014) (internal quotation marks and citation omitted).

### A.    Doe Defendants: Motion for Judgment on the Pleadings

Corizon argues that some of the Estate's claims aren't even plausible on the face

of the amended complaint, so judgment should be granted on that basis.

The only issue I can address on the face of the complaint is the presence of

unnamed defendants. To the extent claims against unnamed individuals, or Doe

defendants, are reasserted in the amended complaint, they are again dismissed for the

same reasons as I noted before. (DE 21 at 4.) As the Seventh Circuit has noted: "[I]t is

pointless to include lists of anonymous defendants in federal court; this type of

placeholder does not open the door to relation back under Fed. R. Civ. P. 15, nor can it

otherwise help the plaintiff." *Wudtke v. Davel*, 128 F.3d 1057, 1060 (7th Cir. 1997)

(citations omitted).

We are therefore left with Corizon as the only defendant in this case. As

demonstrated below, the failure to name specific natural persons as defendants and to

present facts regarding those individuals' knowledge and actions eviscerates this case,

as it leaves only the difficult-to-prove policy claims against Corizon itself. It is baffling

that no individual nurses, doctors or other medical providers were named as

defendants in this case, despite the fact that the Estate evidently had all the medical

reports where the individual care givers were identified. But that is the choice the Estate

made. And so I will move next to the claims against Corizon.

### B. Corizon's Summary Judgment

Corizon seeks summary judgment on the § 1983 claims brought against it. The prisoners' letters attached to the Estate's opposition to the motion for summary judgment are arguably not admissible because they are not under oath. But Corizon hasn't moved to strike the letters. As the Background section of this Opinion suggests, I will consider the letters since Corizon hasn't objected to them. But their contents, while helpful in giving some background on the care that Mr. Helton received, are not dispositive of the case. So I will consider the letters, although they ultimately aren't enough to defeat summary judgment.

The Estate's first and third claims are explicitly raised under § 1983 for failure to provide medical care and supervisory liability for failure to train and supervise. There can be no question that Helton's medical condition was objectively serious, so we move on to the subjective culpability inquiry. *Pittman v. Cnty. of Madison*, No. 12-3233, 2014 U.S. App. LEXIS 4444, at *21 (7th Cir. Mar. 10, 2014). "In order to recover against a municipal or corporate defendant under section 1983, it is not enough for the plaintiff to show that an employee of the municipality or corporation violated his constitutional rights; he must show that his injury was the result of the municipality's or corporation's official policy or custom." *Rice v. Corr. Med. Servs. (In re Estate of Rice)*, 675 F.3d 650, 675 (7th Cir. 2012). The Estate's allegations use the words "custom, policy, or practice," but the Estate presents no evidence supporting the existence of a policy, and in fact doesn't even explain what the offending policy might have been. The opposition to the current

motion simply says that "[t]he complaint identifies CMA [*sic*] [now Corizon] personnel, in the correctional institute housing Mr. Helton had a [*sic*] unconstitutional policy of failing to provide 'adequate' medical care to Mr. Helton, even after receiving complaints from inmates housed with Mr. Helton, resulting in his death." (DE 47 at 5.) But this refers only to the alleged failure of Corizon personnel to treat Helton, not to a wider policy of not providing adequate treatment to inmates.

Reading the claim broadly, as is appropriate at this stage of litigation, it alleges a policy of providing inadequate healthcare to prisoners, as exemplified by the allegedly poor care that Helton received. However, the only actual instance of allegedly poor healthcare in evidence is Helton's situation. While the mere allegation of a policy or practice is sufficient to defeat judgment on the pleadings, the Estate has to make a factual showing to survive summary judgment. Again, one instance of the allegedly wrongful conduct supporting the existence of a policy won't suffice to show there was a policy. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) ("The district court found, and we agree, that these three incidents were too few to indicate that the City had a widespread custom of which City policymakers had reason to be aware."); *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988)). The Estate didn't provide a series of examples of the alleged wrongful behavior indicating a widespread practice, nor did it provide any other evidence of a policy or systemic practice extending beyond Helton's situation. Specifically, the Estate didn't provide examples of repeated subpar prisoner healthcare

(even conclusorily, not to mention providing evidence of such examples); didn't provide its own expert testimony indicating Helton's healthcare was inadequate; didn't question in any manner the care givers who treated Helton; didn't depose Corizon's experts; didn't depose Corizon policymakers or allege any involvement at all by Corizon decisionmakers; and didn't provide any internal records or other evidence of a relevant policy. *See, e.g., Weichman v. Clarke*, 434 Fed. Appx. 545, 548-49 (7th Cir. 2011) ("[W]e turn first to [plaintiff's] claim that he was unconstitutionally denied medical treatment in the jail. We accept [plaintiff's] sworn assertion that he requested medications and did not receive them. But beyond that, [plaintiff] presents no competent evidence to support a finding of a county policy or widespread practice of any kind related to inmate medical care. Although he alleges in his sworn complaint that jail policy mandated that he receive no care, conclusory assertions without substantiation of such a policy, such as internal records, policymaker statements, or evidence of repeated violations, will not defeat a motion for summary judgment.") (citing *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007); *Helvey v. City of Maplewood*, 154 F.3d 841, 843-45 (8th Cir. 1998); *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998); *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995); *Strauss v. City of Chicago*, 760 F.2d 765, 768-70 (7th Cir. 1985)).

The only evidence even hinting at a relevant policy is the statement in one of the prisoner letters that "[n]o way was it natural causes [that led to Helton's death]. It was money & that we are disposable." (DE 47-1 at 5.) This unsupported and general

accusation apparently aimed at the whole (pejoratively so-called) prison industrial complex doesn't get the Estate past summary judgment. Even this statement only actually addresses Helton's healthcare. The Estate's only evidence (other than another copy of the autopsy) is the rest of the letters, and these, too, only address Helton's medical treatment. I therefore grant summary judgment to Corizon on the § 1983 claims.

The second claim is confusing. I can't tell whether the Estate is alleging negligent training and supervision under § 1983 or under a state law negligence approach. The other three claims specifically identify whether they arise under § 1983 or state law. It could be § 1983 claim, alleging a policy or pervasive practice of poor training. To the extent that the second claim arises under § 1983, the Estate would need to allege and provide some evidence of a particular faulty policy, as with the first and third claims, and the Estate hasn't done that, so the second claim is dismissed for the same reasons. The language of the second claim also suggests that this claim is directed at specific natural persons who were intended to be named in another amended complaint, alleging that Corizon supervisory employees have a duty to train and supervise, each of the supervisors failed to discharge their duties, and the defendants failed to train and supervise nurses, *etc*. The reference to the obligations of specific Corizon employees and to multiple defendants, rather than the singular Corizon, suggests that this is the correct interpretation of the claim. If so, as the Doe defendants went, so goes this claim – it

alleges wrongs by unknown people who have been dismissed from the case, so judgment is also granted on this claim.

Corizon has proffered Helton's medical records and autopsy report, as well as expert opinions regarding Helton's health and cause of death. This evidence would be relevant if I had to reach the issues of deliberate indifference or negligence on any of the claims, but I don't. So I won't analyze Corizon's evidence supporting its argument that its employees weren't deliberately indifferent or negligent.

### C.      State Law Wrongful Death Claim

I decline to address the merits of the only claim remaining, the fourth claim, alleging negligence and wrongful death under Indiana state law, and I relinquish supplemental jurisdiction over it. *See Rice v. Corr. Med. Servs. (In re Estate of Rice)*, 675 F.3d 650, 689-90 (7th Cir. 2012) (reversing and remanding because summary judgment finding on § 1983 claims of no deliberate indifference did not apply preclusively to negligence standard applicable to state law claims). Principles of comity encourage me to relinquish supplemental jurisdiction over state law claims when all of the federal claims get disposed of prior to trial. *See Hansen v. Bd. of Trs. of Hamilton Southeastern Sch. Corp.*, 551 F.3d 599, 608 (7th Cir. 2008); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."); 28 U.S.C. § 1367(c)(3). The Estate will not be prejudiced by dismissal of the action from federal court because it may be able to refile the case in

state court as appropriate under Indiana's savings statute, Ind. Code § 34-11-8-1, and the tolling provision of 28 U.S.C. § 1367(d). I therefore relinquish jurisdiction, and dismiss the state law claim against Corizon without prejudice.

## CONCLUSION

Therefore, for the foregoing reasons, I (1) **GRANT** Corizon's motion for judgment on the pleadings with respect to the Doe defendants, (2) **GRANT** Corizon's motion for summary judgment on the first, second and third claims, and (3) **RELINQUISH JURISDICTION** over the fourth claim arising under Indiana state law, dismissing that claim. (DE 42.)

**SO ORDERED**.

ENTERED: May 8, 2014

/s/ Philip P. Simon
**PHILIP P. SIMON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**